O'MEARA, Respondent, *v.* McDERMOTT, Appellant.

(No. 2,714.)

(Submitted November 13, 1909. Decided November 22, 1909.)

[104 Pac. 1049.]

*Promissory Notes—Services—Quantum Meruit—Nonsuit—Estoppel—Nonresident Witnesses—Evidence—Admissibility.*

Contracts—Services—Nonsuit.

1. Nonsuit as to one of three causes of action, which alleged that plaintiff had performed services for defendant at the latter's special instance and request at a stipulated sum, was properly granted, where plaintiff himself had testified that there was no agreement relative to compensation and that he expected none, but that the work he did was done as defendant's partner, and, as such, he was entitled to his share of the profits.

*Quantum Meruit*—Work and Labor—Evidence—Nonsuit.

2. Where in an action to recover on a *quantum meruit* for services alleged to have been rendered in the promotion of a mining deal, plaintiff, a miner, had testified that he took no part in promoting it, and the only testimony on the question of the reasonable value of the services was his opinion that they were worth $25,000, which opinion was not based upon any knowledge as to the value of the services of a promoter but upon a claim of partnership with defendant in the transaction, nonsuit should have been granted.

Promissory Notes—Pleading and Proof—Incompetent Evidence.
3. In an action on a promissory note claimed to have been given in compensation of services performed by plaintiff in the sale of certain mining claims, the only defenses interposed to which were that the note had been given on condition, which had failed, and that plaintiff had never accepted it, evidence as to what the latter's services were reasonably worth and what defendant had received for disposing of the claims was incompetent and immaterial.

Estoppel by Record—Pleading.
4. An estoppel by record must be pleaded, if there is an opportunity to do so.

Pleading and Proof—Estoppel by Record—Variance.
5. Where an answer was drawn upon the theory that plaintiff was estopped by a judgment in a former action, the estoppel pleaded could not be supported by evidence showing that he was estopped by an election of remedies.

Nonresident Witnesses—Evidence—Transcript of Former Trial—Admissibility.
6. Where plaintiff was one of two plaintiffs, and defendant was one of two defendants in a former action, and in a subsequent one the subject matter in controversy was the same as that litigated in the first, testimony given in the former one by a witness absent from the state at the time of the second trial was competent, under section 7887, Revised Codes, precise nominal identity of all parties not being essential.

*Appeal from District Court, Silver Bow County; Jeremiah J. Lynch, Judge.*

ACTION by John H. O'Meara against Peter T. McDermott. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

*Mr. Jesse B. Roote* and *Mr. John J. McHatton* submitted a brief on behalf of Appellant; *Mr. C. B. Nolan,* of counsel, argued the cause orally.

The condition of the note required payments to be made as provided for in the lease and bond, and unless the payments were so made, the note was to be null and void. The respondent not only failed to show a compliance with these essential conditions, but he affirmatively shows a noncompliance with them. In the presentation of proof, he failed in every particular to sustain the allegations of the complaint, and, on the proof thus submitted, a nonsuit should have been granted. (*Stotesbury* v. *Power,* 27 Mont. 469, 71 Pac. 675.) Where an obligation is contracted on condition that an event shall happen within a fixed

time, the condition will be considered to have failed when the event has not occurred within the time. (*Yateman* v. *Broadwell,* 1 La. Ann. 424; *Bagley* v. *Cohen* (Cal.), 50 Pac. 4; *American Nat. Bank* v. *Dancy* (Tex. Civ. App.), 40 S. W. 551; 9 Cyc. 615.)

In the replication it is alleged that, if the agreement with Galiger and Clymo was not met, the defendant caused the same not to be met, and consented to the same not being met for the express purpose of defeating his contract, and that he is estopped from asserting that the payments were not met as specified in the lease and bond. These averments are meaningless, and in no manner affect the principles heretofore discussed. "Facts in a pleading should be alleged in issuable form, and not as a contingent or hypothetical proposition." (6 Ency. of Pl. & Pr., p. 270, par. 6; *Suit* v. *Woodhall,* 116 Mass. 547; *Starbuck* v. *Dunkle,* 10 Minn. 168, 88 Am. Dec. 68; *Jamison* v. *King,* 50 Cal. 132; *White* v. *Camp,* 1 Fla. 118.)

The services in question in the second cause of action clearly contemplate a sale of real estate, and to authorize a recovery for such services, a written agreement should exist. (Revised Codes, sec. 5017.) The services rendered consisted in procuring purchasers for mining claims, and are clearly within the provisions of the statute referred to. (*King* v. *Benson,* 22 Mont. 258, 56 Pac. 280.) The denial in the answer is as effective for letting in the statute of frauds as if the statute had been specifically pleaded. (*Dunphy* v. *Ryan,* 116 U. S. 491, 6 Sup. Ct. 486, 29 L. Ed. 703; *May* v. *Rice,* 101 U. S. 231, 25 L. Ed. 797; *Birchell* v. *Neaster,* 36 Ohio St. 331; *Hunter* v. *Randall,* 62 Me. 426, 16 Am. Rep. 490; *Boston Duck Co.* v. *Dewey,* 6 Gray (Mass.), 446; *Feeney* v. *Howard,* 79 Cal. 525, 12 Am. St. Rep. 162, 21 Pac. 984, 4 L. R. A. 826; *Dung* v. *Parker,* 52 N. Y. 496, 497; *Buhl* v. *Stephens,* 84 Fed. 922; *Raub* v. *Smith,* 61 Mich. 543, 1 Am. St. Rep. 619, 28 N. W. 676.)

Undoubtedly some of the services rendered by the respondent in this case were of such a nature that recovery for same could be had on a *quantum meruit,* but these are so interwoven with those against which the statute declares as to render invalid

the obligation in its entirety. The rule is, that if the services of the promoter, looking to sales of the mining claim, are blended with the services of the miner performing the acts for which recovery might be had upon a *quantum meruit,* then the entire contract is void and no recovery can be had. (*Thayer* v. *Rock,* 13 Wend. 53; *Crawford* v. *Morrell,* 8 Johns. 253; *Baldwin* v. *Palmer,* 10 N. Y. 232, 61 Am. Dec. 743; *Clark* v. *Davidson,* 53 Wis. 317, 10 N. W. 384; *Howard* v. *Brower,* 37 Ohio St. 402; *Meyers* v. *Schemp,* 67 Ill. 469; *Irvine* v. *Stone,* 6 Cush. (Mass.) 508; *Van Alsine* v. *Wimple,* 5 Cow. 162; *Liddle* v. *Needham,* 39 Mich. 147, 33 Am. Rep. 359; *Fuller* v. *Reed,* 38 Cal. 99; *Potter* v. *Arnold,* 15 R. I. 350, 5 Atl. 379; *Becker* v. *Mason,* 30 Kan. 697, 2 Pac. 850.)

The court erred in allowing respondent to answer the question what the value of his services in the sale of the mining claims was. He did not possess a qualification to entitle him to answer the question as he did. (*Little Rock & Ft. Smith Ry. Co.* v. *Bruce,* 55 Ark. 65, 17 S. W. 363; *Cincinnati Tract Co.* v. *Stephens,* 75 Ohio St. 171, 79 N. E. 235; *Miller* v. *Early* (Ky.), 58 S. W. 789; *Schuhle* v. *Cunningham,* 14 Daly, 404.)

Complete mutuality or identity of all the parties is not necessary to admit testimony in a former suit. It generally suffices if the issue be the same and the party against whom it is offered had full opportunity of cross-examination. (*Closson* v. *Barbancy,* 7 Rob. (La.) 438; *Fredericks* v. *Judah,* 73 Cal. 604, 15 Pac. 305; *Philadelphia, W. & B. R. Co.* v. *Howard,* 13 How. 307, 14 L. Ed. 157; *Morehouse* v. *Morehouse,* 17 Abb. (N. C.) 407; *Rucker* v. *Hamilton,* 3 Dana (33 Ky.), 36; *Jones* v. *Wood,* 16 Pa. (4 Harris) 25; *Yale* v. *Comstock,* 112 Mass. 267.)

There was a brief by *Messrs. Maury & Templeman,* and *Mr. M. F. Canning,* for Respondent, and oral argument by *Mr. J. L. Templeman.*

Counsel interpose the objection that O'Meara's services were rendered in connection with the sale of mining claims, and that no written agreement existed therefor. This objection is now

raised for the first time; hence, it is now too late to raise it in the supreme court. (*Christiansen* v. *Aldrich*, 30 Mont. 446, 76 Pac. 1007.) However, the statute says, unless the agreement for such services be in writing, duly signed, the agreement is invalid. The statute was intended to prevent fraud, and not to further it. To one in the situation of O'Meara, the courts have long since pointed out the course to be pursued, and that is, a count upon a *quantum meruit.* (Browne on Statute of Frauds, 5th ed., p. 145, and cases cited.) Nor does the particular subdivision of our statute of frauds under discussion apply to verbal agreements between brokers to co-operate in making sales for a share of the commissions. (*Gorham* v. *Heiman,* 90 Cal. 346, 27 Pac. 289.) Nor is it essential to the validity of an agreement made by parties to share in the profits of a contemplated speculation in real estate that it should be in writing. (*Jones* v. *Patrick,* 140 Fed. 403.) O'Meara's testimony relating to what his services were worth relative to the sale of the mining claims was competent. (17 Cyc. 116; *Mercer* v. *Vose,* 67 N. Y. 56.)

To make testimony given at a former trial competent, "the issue * * * must have been substantially the same, for otherwise it cannot be supposed that the former statement was sufficiently tested by cross-examination upon the point now in issue." (Wigmore on Evidence, sec. 1387; *Schindler* v. *Railroad Co.,* 87 Mich. 400, 49 N. W. 670; *Norris* v. *Monen,* 3 Watts (Pa.), 465; *Melvin* v. *Whiting,* 7 Pick. (Mass.) 79; *Hooper* v. *Southern Ry. Co.,* 112 Ga. 96, 37 S. E. 165.)

Where there is an express contract, evidence of the reasonableness of a commission is not admissible. Where there is a conflict of testimony as to the agreement, evidence of what other agents engaged in the same business at the time received is competent. And where there is no agreement as to amount, such evidence is admissible to show what would be a reasonable compensation. (10 Ency. of Ev. 40; *Hollis* v. *Weston,* 156 Mass. 357, 31 N. E. 483; *Best* v. *Sinz,* 73 Wis. 243, 41 N. W. 169; *Elting* v. *Sturtevant,* 41 Conn. 176; *Kelly* v. *Phelps,* 57 Wis. 425, 15 N. W. 385.)

MR. JUSTICE SMITH delivered the opinion of the court.

This case originated in Silver Bow county, and involves appeals from a judgment in favor of the plaintiff for the sum of $12,000, and an order of the district court denying defendant's motion for a new trial. The cause was tried to the court sitting with a jury, and the verdict was for the sum just mentioned.

The complaint sets forth three separate causes of action. The first is founded upon the following written instrument:

"Butte, Mont., March 27, 1907.

"For value received, I, the undersigned, promise to pay John O'Meara or his heirs the sum of twelve thousand ($12,000) dollars, under the following terms and conditions, to-wit:

"Payments shall be made subject to the conditions and agreements of the existing lease and bond held by Messrs. Galiger and Clymo, from the undersigned, acting as agent for Rt. Rev. John P. Carroll, in the sale of the Burke and Balaklava mining claims, Silver Bow county, Montana.

"Six thousand ($6,000) dollars shall be paid upon completion of second payment on said lease and bond, less whatever portion of said six thousand ($6,000) dollars shall have been paid before that time. The balance, six thousand ($6,000) dollars, to be paid not later than ten (10) days after the completion of the terms of said lease and bond and the fulfillment thereof.

"Failure to meet payments as specified in said lease and bond agreement nullifies this note.

"PETER T. McDERMOTT."

For his second cause of action the plaintiff alleges that between the first day of October, 1906, and the first day of April, 1907, he performed services in and about procuring purchasers for the Burke and Balaklava lode claims for which the defendant agreed to pay him a reasonable price; that a reasonable price and value for the services so performed is the sum of $12,700, no part of which has been paid, except the sum of $700.

For a third cause of action the plaintiff alleges that he performed services for the defendant at his special instance and

request in and about the sale of, and procuring purchasers for, the Burke and Balaklava lode claims, for which defendant agreed to pay him the sum of $12,700, no part of which has been paid, save the sum of $700. But one judgment is demanded, to-wit, for the sum of $12,000, with interest, on account of the three causes of action.

For answer to the first cause of action the defendant avers. that O'Meara and one Kerrigan were making claims against him on account of an alleged liability to them, growing out of the sale of the Burke and Balaklava mining claims, as agent for the Roman Catholic Bishop of Helena, they claiming that he was indebted to them for labor and services performed in connection therewith, and threatening him with trouble on account thereof; that he denied all liability to them, but finally agreed that he would make and deliver the instrument in question, if they would execute and deliver to him a release and full acquittance of all claims and demands whatsoever; that plaintiff and Kerrigan agreed to this, and defendant executed the instrument set forth in the complaint and delivered the same upon that express condition; that O'Meara and Kerrigan thereafter refused to execute and deliver the release and acquittance stipulated for, and, on that account, he alleges the consideration for the written instrument failed. We shall hereafter for convenience refer to the written instrument as the note. Defendant further alleges. in answer to the first cause of action that the plaintiff failed and refused to accept the note, and has ever since failed, refused, and declined to accept the same. He also alleges, in substance, that the conditions of the lease and bond mentioned in the note were not performed, and payments were not made as provided therein; that the agreement for the sale of the property was changed, and Galiger and Clymo never made the payments; that the lease and bond agreement was nullified and became of no force or effect, and both plaintiff and defendant thereafter held the same for naught. For a further defense, he alleges that plaintiff and Kerrigan began an action in the district court of Silver Bow county against him and his wife, in which action they sought

to recover two-thirds of the sum of $125,000, which they alleged became and was due and owing to them on account of the lease and bond mentioned in the complaint, and their services performed for defendant and the sale of the mining claims thereunder; that in said action the defendants answered and the cause was tried; that the court duly made and entered a judgment therein in favor of the defendants and against the plaintiffs, and adjudged that the latter were not entitled to anything from the defendants; that the judgment is in full force and effect, and determined all questions with reference to the right of the plaintiff to recover anything from the defendant on account of the matters set forth in the complaint in this action, and by reason thereof plaintiff is estopped. In addition to the foregoing affirmative allegations, there is a denial of each and every other allegation of the complaint. For answer to the second and third causes of action the defendant denies all of the allegations thereof, and also sets forth the alleged grounds of estoppel hereinbefore recited.

The reply alleges that, if the agreement with Galiger and Clymo was not met, the defendant caused the same not to be met, and consented to the same not being met, for the express purpose of defeating the contract with plaintiff. It admits the bringing of the action mentioned in the answer to the first cause of action, and admits the allegations in the answer to the second and third causes of action to the effect that judgment was entered for the defendants in that action, admits that plaintiff refused to execute and deliver any release or acquittance, and denies generally every other allegation of the answer.

It appeared from the testimony that the Burke and Balaklava quartz lode mining claims belonged to the Roman Catholic Bishop of Helena, and that the Bishop of Helena was Rt. Rev. John P. Carroll. Plaintiff testified, in substance: That on or about the sixth day of April, 1906, he first met the defendant in Butte. He had worked in the Burke and Balaklava ground as a miner, and had some knowledge of the workings there. At the time he met the defendant he was in the livery-stable business, and

defendant was a traveling salesman. Both resided in Butte. On the third or fourth day of October, 1906, while the plaintiff was engaged in teaming at a place called Huntley, about two hundred and fifty miles from Butte, he received a letter from his wife informing him that McDermott had called at his house, and instructed her to write her husband that he, McDermott, had obtained from the bishop an option on the Burke and Balaklava lode claims, and for him, plaintiff, to return to Butte. The option from the bishop reads as follows:

"Helena, Montana, Oct. 1, 1906.

"Mr. P. T. McDermott, Butte, Montana.

"Dear Sir: I will give you this option on the Burke and Balaklava mining claims in the Butte district to run sixty (60) days, cash price for above claims two hundred and fifty thousand ($250,000) dollars; on a lease and bond for one year for three hundred thousand ($300,000) dollars, payable in four installments, as follows: The first payment seventy-five thousand ($75,-000) dollars, at beginning of lease, and seventy-five thousand ($75,000) dollars each four months thereafter until paid.

"JOHN P. CARROLL.

"Bishop of Helena, Montana."

"This option is hereby extended to Jan. 1, 1906.

"JOHN P. CARROLL.

"Bishop of Helena."

Soon after his return from Huntley, plaintiff saw McDermott, who informed him that he was going to Salt Lake City to see a man named Keith. At that time O'Meara gave defendant $25 in money for expenses of the trip, at the latter's request, and also delivered to him, at his request, a rough sketch of the Burke and Balaklava ground, to be used by him in his negotiations with Keith. On October 19, 1906, defendant wrote to plaintiff from Salt Lake City that he had seen Keith, who would probably send an expert to examine the ground. The letter concludes: "Will let you know when, but in the mean time get busy and clean up bottom of shaft and drift so as to be accessible when man gets there. No more news now, but the horizon looks bright."

Plaintiff and another man, whom he paid for his services, worked
three days cleaning up the bottom of the shaft and drift.  Upon
his return from Salt Lake City, sometime during the latter
part of October, defendant went to plaintiff's house and re-
quested him to go with Mr. Frank, an expert, and show him the
property.  Plaintiff took Frank down the shaft, and showed him
the different leads.  In this connection plaintiff testified: "As
to whether or not I was just acting as an ordinary miner in
showing him the ground and the shaft and did not give him any
particular information about it, other than what any miner would
who knew it, I will say that he was an expert and I was a miner,
but I could show him the leads and walls.  I also went to the
claim with Donahue, another mining expert, some time afterward.
I went to the claim with Professor Dwyer and McDermott.  Mc-
Dermott sent Mr. Donahue up for me to show him the ground.
I went up with him and pointed out the ground, walked all over
the claim, and went down the shaft with him and showed him
the same as I showed Mr. Frank, and showed him the corner
posts.  *  *  *  In December, 1906, and January, 1907, Mc-
Dermott asked me regarding Galway during the time he was
negotiating with Galway and others.  He wanted me to go up
and see Galway, and tell him what I knew of the property, and
we made three visits to the office to see him, and then he asked
me to go alone and try, if possible, to see Galway and tell him
about the property.  I did not see Galway personally.  *  *  *
I remember during the time the Galway deal was pending of
going to see Mr. Rombour about the property.  *  *  *  Mc-
Dermott saw Mr. Rombour with me.  He told Rombour that he
would be back in a few days if this (the Galway) deal did not
go through.  *  *  *  McDermott was at my house very fre-
quently from the time he got the option until the time the prop-
erty was disposed of."  The foregoing is the substance of
plaintiff's testimony regarding his services in connection with
the Keith, Galway, and Rombour negotiations, none of which
produced results.

The plaintiff offered in evidence the following writing:

"Bishop's House, Helena, Montana, Feb. 1. 1907.

"Mr. P. T. McDermott, Butte Montana.

"Dear Sir: I hereby authorize you to act as my agent in the transfer and sale of the Burke Balaklava mining claims, situated in the Butte district, Silver Bow county, for a period of sixty (60) days from date.

"ROMAN CATHOLIC BISHOP OF HELENA, MONTANA,

By JOHN P. CARROLL, Bishop."

On March 27, 1907, there was placed in escrow in the First National Bank of Butte a deed conveying the Burke and Balaklava quartz lode mining claims from the Roman Catholic Bishop of Helena to Carle Galiger, trustee. Said deed was deposited upon the following conditions: (1) $85,000 was paid into the bank to the credit of the grantor at the time of the agreement; (2) $157,500 was to be paid on or before June 14, 1907, by Carle Galiger and W. O. Clymo; and (3) the further sum of $157,500 was to be paid on or before September 15, 1907. This escrow agreement and the negotiations leading thereto are referred to in the testimony as "the Galiger and Clymo deal," and we shall for brevity adopt that expression. This deal was consummated and resulted in the transfer of the properties. Regarding it, the plaintiff was asked this question: "What did you do with reference to promoting the sale to Messrs. Galiger and Clymo, and was it at the request of McDermott?" He answered: "He said that Galiger and Clymo would call at the house that afternoon and for me to go home as quick as possible, for they would be there to see me, and for me to take them on the ground and show it to them, and I would have to make it as strong as I possibly could, 'by all means make it as strong as possible,' regardless of what I knew, whether it was right or not. By reason of that request I took Galiger and Clymo on the ground. I was on the ground with Galiger several times afterward. I showed these gentlemen all; that is, explained where the leads were, and explained the cross-cuts underneath from the adjoining properties,

showed them the corner posts. I am acquainted with the report which Galiger and Clymo got out of the ground. McDermott requested me to make a report on the property. I was ready to make a report at any time he had anybody to buy or any proposed purchaser. McDermott requested me to make a report to Galiger and Clymo in February, 1907. After that request was made to me by McDermott, Galiger and Clymo took me to Galiger's house, and we wrote it at the house. I furnished the information for that report, and Galiger wrote it. The items of information that I gave to Galiger and Clymo at the request of McDermott related to the cross-cut in from the Modoc, cross-cut in from the High Ore No. 2, cross-cut from the Leonard on the 1,200, also some ore I got out of the Burke claim by going down the shaft of the Modoc. I didn't get it. I got a man to get it from the 400. McDermott retained my services in the sale of the Burke and Balaklava from April, 1906, until the deal was completed in March, 1907. I first learned of the existence of the instrument dated February 1, 1907, creating McDermott the agent for the sale of the properties early in January last (1908) during the trial.'' This question was then asked the plaintiff: ''Do you know what was paid for some services of a similar nature to those which you performed for McDermott and in a same transaction and during last year?'' He answered that he did, whereupon this question was asked: ''What was the value of your services rendered to McDermott in the sale of the Burke and Balaklava lode claims?'' He answered, over objection: ''My services I considered worth more than $25,000.'' He also testified that the highest price he had ever received for a day's work was $17.50, and that his ordinary pay as a miner was $4 per day. He further testified: ''Mr. McDermott, after he made the sale, agreed to give me $12,000, $10,000 when he came back from Helena after seeing Bishop Carroll, the balance in stock as soon as the company would have straightened out their stock. He was to give me $25,000 in stock. McDermott paid me $700 in two payments; $500 in the first payment. The first payment was a few days ahead of the note which was in-

troduced in evidence, the date of which is March 27, 1907, and
he paid me the $200 on the day he delivered the note to me—
a little previous.''

. Cross-examination: ''I was a witness in the case of myself and
Kerrigan against McDermott and his wife. I was suing Mc-
Dermott in that case to recover money for the partnership. I
considered that my services were worth what McDermott offered
me, 25,000 shares of stock and $10,000; that would be $35,000.
I did not know at that time that he was acting as agent for the
bishop. I did not know what the contract with Galiger and
Clymo was. I learned that he was acting as agent for the bishop
when we came to trial the last time, but I knew the note read
that way. I read the note the same day I received it. I knew
at that time he was agent for the bishop. I am suing for $12,000.
I sued for one-third of'what he made over the bishop's price.
I am not claiming for any services in connection with this lease
and bond, excepting for services in connection with this lease
and bond to Galiger and Clymo in this suit. I am not suing for
any other services. We rendered him services to different par-
ties and Galiger and Clymo. I understood I was suing for the
services rendered in the Burke and Balaklava deal. I know the
agreement with Galiger and Clymo was entered into on February
2, 1907; but I do not know the exact date when Galiger and
Clymo came to the house after me—whether it was February
2 or later. I acknowledge that there was no compensation or
agreement mentioned between McDermott and me. But, when
we went into the agreement, we entered as partners in the Burke
and Balaklava mining claim. The suit which you have referred
to heretofore, being O'Meara and Kerrigan against McDermott,
was upon that basis. I went in with him on that work as a
partner. Aside from the note, he did not promise to pay me
because I was not looking for promises of payment. I was look-
ing for a partnership. With reference to all of this work which
I have testified to, I did it all as a partner. I fixed the purchase
price of the property—I named it. I do not know the eastern
parties that came and had dealings with Clymo and Galiger af-

ter I became interested in the property. I never took them on the property. The last thing I did in connection with the Galiger and Clymo contract was that Mr. Galiger and I were down there on different occasions looking for the corner posts, and looking for the leads and boundaries. That was sometime early in the month of March. McDermott told me of the agreement entered into by him and the bishop, by him on behalf of the bishop, with Galiger and Clymo. As far as I know, that agreement was carried out. I did not hear any different. When I got this paper (the note), I was claiming to be a partner in the sale of the property. Q. And it was as such that you took the paper, was it not? A. For a part of the payment. I took it for a part of the payment which I claimed I was entitled to as a partner. During the negotiations with Galiger, McDermott came to my house and said: 'Will you take $25,000 for your chances in your share?' I said: 'I am willing to let my share go the same as the others.' If he did not make a deal and turn the property, of course, there would be nothing in it, and whatever was done up to that time would be lost labor and work. There was no agreement for compensation up to the time McDermott got the option and the time he gave me that note.''

Plaintiff was asked by his counsel, on redirect examination, how much of the money realized under the Galiger-Clymo contract was to go to McDermott. Over the defendant's objection he answered that $125,000 was to go to McDermott, and $275,000 to the bishop. He continued: "I first saw the option of Octo-ber 1 after I brought my first suit against McDermott. I did not know that the agency agreement of February 1, 1907, existed until I saw it.''

E. B. Weirick, cashier of the First National Bank of Butte, testified as to the dates when the different installments going to make up the sum of $400,000 were paid to the plaintiff as agent and attorney in fact for the bishop. These payments were not made upon the exact dates mentioned in the contract, but they were all finally made substantially as stipulated for.

H. A. Galway testified that pending his negotiations with regard to the Burke and Balaklava claims, McDermott told him that he had some friends he wanted to take care of in the matter, and mentioned O'Meara.

Dan Shields testified that in March, 1907, McDermott told him that O'Meara and Kerrigan were "still in with him and helped him all the way."

Margaret O'Meara, wife of the plaintiff, testified that about October 2, 1906, defendant came to her house and told her that the bishop had given "us" an option and bond on the Burke and Balaklava, that the price was to be $250,000 if it was a cash proposition, and $275,000 outside of six months, and asked her to write her husband and tell him all that McDermott had told her and request him to return to Butte "as quick as possible."

John Kerrigan testified: "About the 10th of October McDermott told me: 'We have got the Burke and Balaklava.' I know whom he meant by 'we.' He meant Peter T. McDermott, John H. O'Meara, and John Kerrigan." The witness was asked this question: "Q. Can you recall anything that McDermott said as to how much of the purchase price was going to the Roman Catholic Bishop?" Defendant's counsel objected to the question, and the court inquired: "What is the purpose of it?" Plaintiff's counsel replied: "The purpose is to show the value of the services rendered by O'Meara to McDermott and the profits realized out of this service." The objection was overruled, and witness answered: "The amount was $275,000. McDermott said that the balance $125,000 was his." Kerrigan's testimony substantiated that of O'Meara in many other respects.

At the close of plaintiff's case, the defendant interposed a motion for a nonsuit as to all causes of action. The court sustained the motion as to the third cause of action, and overruled it as to the first and second. Appellant contends that this latter action was error. The following discussion will disclose the principal grounds of the motion. We are satisfied that the court was correct in sustaining the motion as to the third cause of action, and are of opinion that it should have been sustained as

to the second cause of action also.   Plaintiff expressly states that there was no agreement for compensation, and that he expected none.   He was looking for compensation, not from McDermott, but from the partnership.   He claimed to be a partner and still so claims, and was seeking a share of the partnership profits. He expressly states: ''With reference to all this work which I have testified to, I did it as a partner.''   He makes no claim to compensation for any services performed prior to the Galiger and Clymo deal.   He expressly stated that he was claiming for no services ''excepting for services in connection with'' the lease and bond to Galiger and Clymo.   And there are other reasons why the motion should have been granted as to the second cause of action.   The plaintiff's testimony shows that he had nothing to do with interesting Messrs. Galiger and Clymo in the deal. He had no knowledge that they had become interested until Mc-Dermott informed him of it.   He says that the agreement with Galiger and Clymo was entered into on February 2.   He was asked this question: ''What did you do with reference to promoting the sale to Messrs. Galiger and Clymo?''   He answered: ''He [McDermott] was going south on his tea business, and he said that Galiger and Clymo would call at the house that afternoon, and for me to take them on the ground and show it to them.''   He also testified: ''I do not know the exact date when Galiger and Clymo came to the house after me—whether it was February 2 or later.''   This testimony shows that the services rendered by him were performed after Galiger and Clymo had obtained their option.   In other words, O'Meara had no part in ''promoting'' the deal prior to February 2.   It appears from his testimony that a report was to be made on the property, not for the purpose of inducing Galiger and Clymo to take an option, but apparently with a view of enabling them to either dispose of the property to third persons, or obtain the money to take up the option from some third person or persons to whom it was considered advisable to make a report.   So far as his testimony goes, it discloses the fact that the services performed by him were simply such as any miner could have performed who was ac-

quainted with the ground.  Of course, if he were a partner in all of McDermott's operations, an entirely different question would be presented.  And equally, of course, McDermott could agree to pay him $12,000, or any other sum, for the services which he had actually performed.  But when he places himself in the position of claiming a reasonable compensation for his services, independently of any contract on the subject, it is incumbent upon him to show what those services were reasonably worth.  The only testimony on this subject came from himself.  He said he considered his services worth more than $25,000.  This testimony furnished no basis for a $12,000 verdict, or any verdict.  It was simply his opinion of the value of his services, based, confessedly, not upon any knowledge he possessed as to the value of the services of a promoter, nor upon the value of his services as a miner, but upon the fact that he considered himself a partner, and that he believed McDermott had received $125,000 for his services, acting as agent for the bishop.

Returning, now, to the motion for a nonsuit as to the first cause of action.  As heretofore intimated, we think the evidence shows that the contract with Galiger and Clymo was substantially performed.  The plaintiff's case in chief does not disclose that the note was given upon any condition, or that it was not accepted.  Neither does it disclose that he is estopped by any prior judgment.  Counsel for the defendant have apparently assumed that the testimony of the plaintiff in the other action referred to was a part of his case in chief in this action, and therefore could be considered by this court.  But such is not the fact.  Upon the assumption referred to, the question was suggested in argument, and is raised by the answer and by an offered instruction, whether the minds of the parties met at the time of the delivery of the note.  But we must take the record as we find it.  When the motion for a nonsuit was interposed, there was nothing before the district court showing any partnership agreement between the parties, except plaintiff's bald statement that he considered himself a partner.  Neither was there any substantive testimony that he ever offered to return the note to Mc-

Dermott. He testified that he accepted the note; and as a basis for impeaching testimony he was asked by counsel for defendant whether he had not testified at the other trial that he offered to return the note. His answers were evasive in some respects, but he never positively admitted having so offered. We may not, therefore, consider the matter. We conclude that the court did not err in overruling the motion for a nonsuit as to the first cause of action.

Before taking up the consideration of other questions, it may be well to dispose of certain alleged errors of the court in the admission of testimony, as indicated by the statement heretofore made. It is contended that the court erred in allowing the plaintiff to give his opinion as to the value of his services. We think the question at the time it was asked was a proper one. Plaintiff could well testify, in substantiation of his second cause of action, what the services actually performed by him were reasonably worth. The difficulty arises, not over the question, but in regard to the answer. The latter shows, as heretofore suggested, that it is based upon considerations which he was not warranted in taking into account. It is altogether unreasonable to suppose that the services rendered by him to McDermott, in the absence of any agreement or any actual participation in promoting the Galiger and Clymo deal, were worth $25,000 or any considerable portion of that amount. As relating to the first cause of action alone, the question was incompetent and immaterial. The only defenses interposed to the note itself were (1) that it was given upon condition that an acquittance should be delivered to Mc-Dermott; and (2) that it was never actually accepted by O'Meara. If the note was delivered and accepted unconditionally, it became immaterial to inquire what O'Meara's services were reasonably worth. What has just been said applies equally as well to the action of the court in allowing plaintiff to testify to the amount received by defendant as agent for the bishop. This testimony could only have served to impress the jury with the notion that as defendant had received so large a sum he

ought, upon general principles (if we may allow ourselves the expression), to divide it with his alleged partner.

Taking up now the matters of defense interposed and attempted to be interposed: (a) Whether the note was delivered upon the conditions testified to by the defendant, or accepted by the plaintiff, so as to constitute a binding contract between the parties, were questions for the jury to decide under proper instructions from the court. There can be no question of this as regards the first contention of the defendant. And we make the statement advisedly as to the second, for the following reason: The stenographer who took the plaintiff's testimony in the other case testified that he then swore: "I offered him the note and he would not accept it, and I would not accept it.   *   *   * And I said, 'You can have your note'; and he said, 'I don't want it. It is no good to me.'" We have searched the record in vain for any testimony on the part of McDermott going to show that this conversation was had. So that we say it was a question for the jury to decide whether it did or did not take place; and it was the privilege of the defendant to request the court to instruct them as to its legal effect, in case they found that it did.

(b) Defendant offered in evidence the judgment-roll in the former case of O'Meara and Kerrigan against McDermott and wife, and the same was, upon objection, excluded by the court. It is contended that this was error. We find in the transcript a specification to that effect. In the answer the judgment is pleaded as "a determination of all questions with reference to the right of the plaintiff to recover anything from the defendant"; but this contention is not argued in the defendant's brief. It is contended, however, that the judgment-roll discloses an election of remedies on plaintiff's part, which would estop him from maintaining this action. But this ground of estoppel is not sufficiently pleaded. (See 15 Cyc. 261.) It is clear that the pleader did not have it in mind at the time the answer was drawn. There was an opportunity to plead it, but defendant neglected to do so. Therefore it cannot avail him. (8 Ency. Pl. & Pr. 9; 16 Cyc.

806; *Meyendorf* v. *Frohner,* 3 Mont. 282.)   And there is nothing in the record to indicate that the matter of estoppel by election of remedies was ever contended for by the defendant until after the cause reached this court.   When the judgment-roll was offered in evidence, no claim was made that it disclosed the fact that plaintiff had elected to pursue another and inconsistent remedy against the defendant.   In fact, no statement was made by counsel as to the purpose for which it was offered, and the presumption is therefore that it was offered in support of the allegation that the plaintiff was estopped by judgment.   The estoppel pleaded cannot be supported by evidence tending to show another and different estoppel.   (16 Cyc. 811; *Parrott* v. *Dyer,* 105 Ga. 93, 31 S. E. 417; *Ford* v. *Mayo,* 91 Ky. 83, 12 Ky. Law Rep. 665, 15 S. W. 2; *Donnell* v. *Reese,* 6 Kan. App. 563, 51 Pac. 584.)   The answer was drawn upon the theory that plaintiff was estopped by the result of the former action, to-wit, the judgment.   The contention now is that he was estopped by his action in electing to institute that cause.

(c) Defendant attempted to introduce the testimony of W. O. Clymo given in the former action heretofore referred to. Plaintiff interposed an objection, and the court excluded the evidence.   It was shown that Mr. Clymo was in the state of California.   The testimony was competent, and should have been received, if properly offered.   (Revised Codes, sec. 7887.) It related to the same matter which was being investigated. This is shown by the testimony itself, taken in connection with the evidence given by the plaintiff.   It related directly to the question of what services had been performed by him, and whether he had performed any services in connection with the Galiger and Clymo deal other than such as could have been performed by any miner.   Clymo directly contradicted the the plaintiff's testimony on that subject, and the latter's counsel cross-examined him at great length.   The parties were the same; that is, the plaintiff and defendant here were, respectively, a plaintiff and a defendant in that action.   Precise nominal identity of all the parties is not necessary in order to make

the testimony competent. (*Allen* v. *Chouteau,* 102 Mo. 309, 14 S. W. 869; *Wright* v. *Cumpsty,* 41 Pa. St. 102.) But plaintiff's counsel contend that the testimony was not offered in a technically correct manner. Whether it was or not need not now be considered, as there must be a retrial in any event.

(d) Again, it is urged upon this court that the district court abused its discretion in refusing to submit special interrogatories to the jury. Section 6758, Revised Codes, provides that in all cases the court may direct the jury to find a special verdict in writing upon any or all of the issues. We are not prepared to say that the district court abused its discretion; but we do venture the opinion that this case was peculiarly adapted to the exercise of the power mentioned in the statute. We are inclined to think that, if the district courts would more frequently instruct juries to find upon particular questions of fact, the necessity for granting new trials would be greatly diminished and much unnecessary expense and delay thereby avoided; and we recommend the practice. It is very often the case that findings upon particular issues would disclose the fact that instructions, palpably erroneous, were not prejudicial.

It is believed that the foregoing disposes, in effect, of all questions involved, and that it is unnecessary to examine the instructions given.

The judgment and order appealed from are reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.